**In re Phyllis Ann KEPHART, M.D., Debtor.**

**Phyllis Ann KEPHART, M.D., Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 92–21082.
Adv. No. 92–2042.**

United States Bankruptcy Court,
W.D. New York.

Jan. 11, 1994.

Christopher K. Werner, Suter, Doyle, Kesselring, Lawrence & Werner, Rochester, NY, for debtor/plaintiff.

Brian M. McCarthy, U.S. Attorney's Office, Rochester, NY, for defendant.

## DECISION AND ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### BACKGROUND

On April 16, 1992 the Debtor, Phyllis A. Kephart, M.D. (The "Debtor"), filed a petition initiating a Chapter 7 case. The only debts listed on the Debtor's schedules were a first mortgage on her residence, a $12,000 personal loan with Marine Midland Bank, a student loan of less than $2,000 due to the Massachusetts Higher Education Assistance Corporation and an indebtedness to the United States of America, U.S. Department of Health and Human Services, National Health Service Corps (The "Service Corps") as part of its Scholarship Program in an amount estimated to be in excess of $625,000. A Section 341 Meeting of Creditors was held and closed on May 29, 1992; a No–Asset Report was filed by the Debtor's trustee; and a Discharge Order was entered on August 7, 1992. Prior to the entry of her discharge, the Debtor commenced an Adversary Proceeding to have the Court determine the dischargeability of her debt to the Service Corps pursuant to the provisions of 42 U.S.C. § 254o(d)(3)(A).[1]

After several pre-trial conferences and attempts by the parties to negotiate a settlement of this matter, a trial of the issues was held before the Court on February 22, 1993, and after additional submissions by the parties on the issue, a further hearing was held at the insistence of the Court on December 10, 1993 to determine the disposable income of the Debtor's household.

The Facts, as established by the pleadings and the testimony and documentary evidence introduced at the trial on February 22, 1993 and the hearing on December 10, 1993, are as follows:

1. The Debtor, at the age of 37, after having raised four children, entered Boston University Medical School in the Fall of 1978.

2. In order to finance her medical school education, the Debtor applied for and was granted a scholarship award by the Service Corps Scholarship Program.

3. Prior to executing the Service Corps Contract, the Debtor discussed the service requirement with her then husband, a career military officer. They determined that the service requirement would not be a problem, since it was anticipated that by the time the Debtor graduated from medical school and completed an internship the Debtor's husband would be retired and their children would be fully grown and independent. As a result, they could be flexible with regard to a service site. Also, because of their experiences with the Debtor's husband being moved by the Air Force on several occasions, the Debtor and her husband felt that they were familiar with the process of negotiating with the Government to settle on service locations which would be mutually beneficial to all of the parties.

4. The Service Corps Contract entered into by the Debtor and the Service Corps (Pl.'s Exhibit 1) requires that for each year of a scholarship award the recipient serve one year in a health manpower shortage area or unit of the Department of Health, Education and Welfare as designated by the Secretary of Health, Education and Welfare (The "Secretary").

5. The Service Corps Contract also provides that should the scholarship recipient, after successfully completing the educational training for which the scholarship was given, fail to begin or complete the period of obligated service, the United States would be entitled to recover an amount equal to three times the scholarship funds awarded plus

---

1. 42 U.S.C. § 254o(d)(3)(A) provides:
   Any obligation of an individual under the Scholarship Program (or a contract thereunder) or the Loan Repayment Program (or a contract thereunder) for payment of damages may be released by a discharge in bankruptcy under title 11 of the United States Code only if such discharge is granted after the expiration of the five-year period beginning on the first date that payment of such damages is required, and only if the bankruptcy court finds that nondischarge of the obligation would be unconscionable.

interest pursuant to a detailed formula set forth in the Contract.

6. The Service Corps Contract further provides that the Secretary may waive or suspend the service or payment obligations under the contract if compliance by the scholarship recipient would involve extreme hardship and the enforcement of such obligation would be unconscionable.

7. Between September, 1978 and June, 1982 while completing medical school, the Debtor received four scholarship awards in the total principal amount of $67,953.

8. In 1981 during her third year of medical school, the Debtor's then husband advised her that he wanted a divorce and moved out. There ensued difficult and severe matrimonial problems and a split up of the family, which ultimately ended in a divorce and had serious negative psychological effects on the Debtor. In September of 1981, the Debtor was hospitalized for ten days and treated for major depression having attempted suicide.

9. Following her graduation from medical school in 1982, the Debtor applied for and received from the Service Corps a two year deferment of the service requirement in order to complete a year of training in family medicine and a year of residency in internal medicine.

10. In August of 1984, after completing her year of training in family medicine and a residency in internal medicine in California, the Debtor requested an additional one year deferment for further training in infectious diseases. The Debtor believed that she needed this additional year of training to be eligible to be board certified in internal medicine, because she had been orally advised by the American Board of Internal Medicine that her year of training in family medicine would not count toward eligibility. The Debtor was granted a conditional deferment, subject to the Service Corps obtaining additional information regarding her ability to be board certified as a result of the further training in infectious diseases. (Pl.'s Exhibit 3). In September, 1984, even though the requested deferment was not yet finalized, the Debtor went to Boston, Massachusetts and began an additional year of residency specializing in infectious diseases.

11. Due to some apparent confusion with the American Board of Internal Medicine, the Debtor was not able to obtain the anticipated confirmation that the additional year at the Boston Veterans Administration Medical Center would be necessary for her to be eligible to become board certified in internal medicine.

12. As a result, in the Fall of 1984 the Service Corps denied her additional one year deferment from service. On November 1, 1984, the Debtor participated in a telephone site selection interview to determine her placement for service. The Debtor testified that she believed that this was only an initial step to a final mutually agreeable service site which the Debtor would report to at the conclusion of her training in the Summer of 1985. However, the Service Corps considered and intended this to be a final site selection interview, since prior mailings to the Debtor concerning site selection and an Early Decision Alternative had not been responded to by the Debtor. (An extensive placement package was mailed certified mail to Debtor in July, 1984 and receipted for by an individual other than the Debtor. (Pl.'s Exhibit 10). The Debtor testified she never received the package.)

13. In the Fall of 1984, the Debtor's mother was very ill (she had suffered a stroke in April, 1984 and later died in February, 1985), and the Debtor was still undergoing psychiatric treatment, was taking medication for depression, was working twelve to fourteen hour days at the Boston Veterans Administration Medical Center and was anorexic.

14. A November 21, 1984 letter from the Service Corps to the Debtor confirmed that it had forwarded site selection questionnaires to the Debtor as part of an Early Decision Alternative package prior to November of 1984 in an attempt to have her participate in the site selection process to assure her the "broadest range of opportunities for assignment." (Pl.'s Exhibit 7). At or about the same time, the Debtor received a service assignment to the State of Louisiana (The "Louisiana Assignment Letter"). The Louisiana Assignment Letter advised the Debtor that as a result of the Early Decision Place-

ment process for 1985 more than 850 individuals had been matched and placed. However, since the Debtor had not participated in that process, after reviewing her site selection questionnaire, she had been assigned to the State of Louisiana. The Louisiana Assignment Letter also advised her that she could begin the process of identifying a position within the specified state and gave her the name of an individual, Mr. Douglas Mahy, in Dallas, Texas to contact regarding her ultimate placement. The Louisiana Assignment Letter further advised that the Service Corps would sponsor a trip so that she could visit the communities within the assigned service area and that any travel should be completed by March 15, 1985 with all matches to be completed by April 15, 1985. The Louisiana Assignment Letter clearly advised the Debtor that if she was not matched by April 15, 1985, she would be assigned to a high priority site based on the needs of the Service Corps which might not even be in the same state as her existing assignment. The Louisiana Assignment Letter encouraged her to call her regional representative and arrange for participation in the placement process and any travel as soon as possible in order to maximize her placement options.

15. The Louisiana Assignment Letter also advised the Debtor that the Service Corps needed to hear from her in writing by December 3, 1984 to confirm her intention to complete her service obligation or it would be assumed that she did not intend to complete her service requirement.

16. Debtor acknowledges that she did absolutely nothing in response to the Louisiana Assignment Letter. The Debtor testified that she felt that she could not go to Louisiana and that because of all of her problems she became psychologically paralyzed and unable to deal with the entire matter.

17. When the April 15, 1985 deadline passed, by telegraphic message dated April 26, 1985, the Debtor was assigned by the Service Corps to The Brownsville Community Health Clinic in Brownsville, Texas. The Debtor was once again advised to contact Mr. Mahy within 5 days in connection with her assignment.

18. When the Debtor once again did nothing but bury her head in the sand and fail to contact Mr. Mahy as required, the Service Corps declared her in default of the conditions of the Service Corps Contract in June, 1985. (Pl.'s Exhibit 9). The Debtor was advised that in accordance with the default formula in the Contract that there was presently due the sum of $359,543.20, which included principal of $203,859.00 and interest of $155,683.20 calculated from the date of each scholarship award payment to the date of default.

19. The Debtor testified that in 1985 she did not respond to either the Louisiana or Texas placement as required because of her continuing psychological and personal problems, because she did not want to be alone in a different place, and because she had met a man who was working in Boston and who she later married in 1986.

20. In early 1986, the Debtor consulted an attorney in Boston in an attempt to arrange with the Service Corps for acceptable service. The Debtor testified that by then she had straightened out her personal life, realized that she could not possibly pay the amounts due to the Service Corps, and wanted to complete her service requirement.

21. By letter dated May 22, 1986, the Service Corps offered to enter into a forbearance agreement with the Debtor and to afford her an opportunity to complete her service requirement at a high priority health manpower shortage area to be determined by the Service Corps without a formal participation by the Debtor in the site selection other than by her completion of a site selection questionnaire, which the Service Corps agreed to refer to in making its placement decision. (Pl.'s Exhibit 15).

22. By her attorney, the Debtor advised the Service Corps that she wished a further extension to July, 1987, because she wished to complete her second year of a two-year Fellowship in infectious diseases and that any ultimate placement must take into account the employment requirements of her husband, a male nurse. However, by letter dated July 23, 1986, the Service Corps advised her that a sub-specialty such as infectious diseases was not necessary to the Service Corps program and, therefore, denied

her request for any delay in completing the forbearance agreement and placement processes. (Pl.'s Exhibit 17). The Service Corps gave the Debtor three weeks to return the forbearance agreement and advised her that if she complied with this requirement, placement would need to be completed within six months. Debtor did not accept the offer of the Service Corps, electing to finish out her Fellowship in infectious diseases.

23. In October, 1986 the Debtor applied for a job at the Veterans Administration Hospital in Bath, New York (The "Bath V.A. Hospital") where she began as a staff physician in July of 1987.

24. The Debtor continues to be employed at the Bath V.A. Hospital where her duties now include taking care of all HIV/AIDS and tuberculosis patients, infectious-disease control and some primary care clinical work.

25. In November of 1988, the United States began garnishing the Debtor's salary in the amount of 15% percent of her gross pay, but she later realized that this was not even amortizing the indebtedness due to the Service Corps.

26. In an attempt to pay her debt to the Service Corps by garnishment and to have enough money to live, the Debtor began moonlighting in 1990 as an emergency room physician in nearby hospitals.

27. The Debtor has repaid the Service Corps $20,531 through the garnishments.

28. The Debtor and her husband's total gross income, including the Debtor's moonlighting, exceeds $160,000 annually.

29. The current monthly disposable income of the Debtor's household when reasonable adjustments are made to current and projected expenses is at least $2000.00.

## DISCUSSION

The parties agree that the obligation of the Debtor to the Service Corps is more than five years old, so that the only issue before the Court is whether the nondischarge of the obligation would be "unconscionable."

On the facts and circumstances of this case the Court believes that finding the obligation due from the Debtor to the Service Corps, which is now in excess of $625,000, to be nondischargeable would be unconscionable. However, the Court also finds that on all of the facts and circumstances of this case to discharge the obligation in full would also be unconscionable. *See In re Gray,* No. 88–12452 (Bankr.D.Mass. March 20, 1990).

Once the default provisions of the Service Corps Contract took effect and a substantial period of time passed, given the Debtor's current or even reasonable potential employment, the outstanding default obligation due to the Service Corps is well beyond the financial ability of the Debtor to pay during the course of her potential working life (the Debtor is 53 years old). Neither the current reasonable disposal income of the Debtor or her household projected over the remaining work life of the Debtor would repay the accrued and accruing interest at the default rate let alone the unpaid principal on the obligation.

In this case, the Debtor's household family budget indicates that with some reasonable reductions in current and projected expenses there is significant disposable income which can be used to repay some portion of the indebtedness due to the Service Corps and the public. Therefore, in the Court's opinion, it would be unconscionable to discharge the indebtedness entirely.

However, the underlying purpose of the Service Corps' Scholarship Program is to obtain highly needed and otherwise difficult to obtain service from professionals who receive scholarship awards, not just the repayment of the Scholarship Award. The United States Government has numerous and varied loan programs to provide financial aid to professionals so that they can obtain a medical education. To convert every Service Corps Scholarship into a simple student loan in the event of a bankruptcy would not serve the Service Corps' underlying mission and would be grossly unfair to the public which supports the program.

Although the Debtor may have been suffering from depression and undergoing serious personal problems from 1984 to 1986 when placement for service should have been completed, she failed to face up to her clearly understood and contracted for service requirement. She consistently required that the performance of the required service be

only at her convenience and to her liking. Clearly, if those were the conditions that the Service Corps had to meet in placing every scholarship recipient, the program would collapse.

In this case, however, the Debtor has and continues to provide a very valuable public service by her work in infectious diseases in the Veterans Administration System, presently at the Bath V.A. Hospital, a service which she testified she intends to continue to provide throughout the rest of her medical career. Some believe that no one deserves the highly professional, kind, devoted and understanding medical care that the Debtor appears capable of and willing to continue to give more than our veterans, who do not always receive such care. Although she is by most standards well compensated for her work in the infectious disease area at the Bath V.A. Hospital, most medical professionals would acknowledge that she could earn more elsewhere and probably under better conditions.

Therefore, in this case the Court believes that the Government and the public, by the Debtor's continuing service in the Veterans Administration system, has and will continue to receive some element of the public service that was expected and contracted for, something more than just the repayment of the cost of the Debtor's medical education.

Interest from July 1, 1982, the approximate date when the Debtor graduated from medical school, through January 31, 1994 at the Federal Post Judgment Rate of Interest for those periods (using the January 1, 1994 rate for January, 1994) is $55,993.44. Deducting the $20,531.00 previously paid to the Service Corps through the garnishment of the Debtor's wages from the accrued interest leaves unpaid interest of $35,462.44. To repay the unpaid pre-default principal of $67,-953.00 together with interest fixed at 3.625% (the Federal Post Judgment Rate of Interest was 3.61% at January 1, 1994) and the unpaid interest of $35,462.44 over five (5) years would require payments of approximately $1831.00 per month. However, the reasonable disposable income of the Debtor's household, for as long as she continues to moonlight (which the Court acknowledges is difficult for the Debtor), is at least $2000.00 per month. If this amount, which the Debtor can afford, is paid to the Service Corps over five years, it and the public will receive slightly more than the cost of the Debtor's medical education plus a reasonable interest and present value factor.

On all of the facts and circumstances of this case, requiring the Debtor to repay the Service Corps $2000.00 per month for sixty (60) consecutive months while continuing to work in the Veterans Administration System is not unreasonable and would fairly compensate the Government and the public for the cost of the Debtor's medical education and her service default under the Service Corps Contract.

However, to insure that the crucial element of service continues, should the Debtor not continue full time employment at either the Bath V.A. Hospital or another facility within the Veterans Administration System before the $120,000 in consecutive monthly payments is paid or should the Debtor remain in the Veterans Administration System but not repay the $2000.00 per month for the required sixty (60) consecutive months, the remaining unpaid obligation due from the Debtor to the Service Corps (approximately $625,000 less any payments) is deemed nondischargeable.

The Debtor shall continue to have the option to serve at a facility designated by the Service Corps (in its sole discretion as to location) with one-fourth of the obligation ($120,000 or approximately $625,000 less payments made if the Debtor defaults under this Decision and Order) being forgiven for each full year of service, provided that the Debtor requests such service either while she is current on the monthly payments required by this Decision and Order or within 30 days of any default by her in such payment, and further provided that the Debtor reports and begins her service within 90 days of when a service location has been assigned. Should the Service Corps not allow the Debtor to voluntarily serve if she requests to be able to serve as provided for herein, the entire then remaining unpaid obligation due to the Service Corps ($120,000 or approximately $625,-000 less payments made) shall be discharged.

## CONCLUSION

The Debtor shall pay to the Service Corps $2,000.00 per month commencing March 1,

1994 for sixty (60) consecutive months in full satisfaction of the obligation due from the Debtor to the Service Corps provided that during that period the Debtor continues full-time employment at either the Bath V.A. Hospital or another facility within the Veterans Administration System. The Debtor has the right to prepay the amounts at any time that she is current on her monthly payments provided that she continues to work in the Veterans Administration System until March 1, 1999. In the event such payments are made and such employment in the Veterans Administration System continues, any amounts otherwise due to the Service Corps are dischargeable and discharged.

In the event that the Debtor continues full-time employment in the Veterans Administration System but fails to pay the $2,000.00 per month for sixty (60) consecutive months or earlier, the current obligation due from the Debtor to the Service Corps (approximately $625,000 less payments made) shall be nondischargeable.

In the event that the Debtor terminates full-time employment with the Veterans Administration System prior to the payment to the Service Corps of $2,000.00 per month for sixty (60) consecutive months or earlier and prior to March 1, 1999, the current obligation due from the Debtor to the Service Corps (approximately $625,000 less payments made) shall be nondischargeable.

The Debtor shall continue to have the option to serve at a facility designated by the Service Corps, in its sole discretion as to location, on the conditions previously set forth, with one-fourth of the obligation due to the Service Corps ($120,000.00 or approximately $625,000 less payments made) being forgiven for each full year of service. Should the Service Corps not allow the Debtor to voluntarily serve if she requests to serve and otherwise complies with the provisions of this Decision and Order regarding service, any remaining unpaid obligation due the Service Corps shall be discharged.

**IT IS SO ORDERED.**